## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | ) | |
| **PABLO CASTELLANOS-HERNANDEZ,** | ) | **Civil Action No.** |
| | ) | |
| **Plaintiff** | ) | **22-CV-728 (OAW)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SUBURBAN SUBARU. INC.,** | ) | |
| | ) | |
| **Defendant** | ) | **NOVEMBER 17, 2022** |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS

### Introduction and Summary of Argument

Suburban Subaru sold a 2020 Subaru Legacy (the "Subaru") to the plaintiff, Pablo Castellanos-Hernandez ("Castellanos"), under a retail installment contract. When it was unable to assign that contract to a third-party, Suburban Subaru told Castellanos that if he wanted to retain the Subaru, he must submit a new credit application with his spouse as co-signer. Castellanos reluctantly agreed, and Suburban Subaru entered into a new retail installment contract for the sale of the Subaru, with Castellanos and his spouse as buyers.

Suburban Subaru's conduct violated the Equal Credit Opportunity Act ("ECOA"), because it revoked the credit that it had originally extended without providing notice of its adverse action. Suburban Subaru further violated ECOA by conditioning the second sale upon the participation of Castellanos's spouse—and not any credit-worthy individual—as a co-signer. This violated Regulation B's "spouse-

guarantor" rule, which prohibits the conditioning of credit upon having a spouse as a co-signer.

Suburban Subaru also violated the Retail Installment Sales Finance Act ("RISFA") and Article 9 of the Uniform Commercial Code ("UCC"), because it constructively repossessed the Subaru without providing Castellanos with notices that he was entitled to receive. The constructive repossession was the result of its exercise of dominion and control over the Subaru, which culminated in a re-sale of the Subaru to Castellanos and his spouse. Indeed, Suburban Subaru could not have re-sold the Vehicle if it had not regained constructive possession.

Suburban Subaru also violated the Truth in Lending Act ("TILA") in both the original sale and the subsequent sale. In the first transaction, it violated TILA by failing to disclose that the annual percentage rate of interest was an estimate, which was required because it had conditioned the extension of credit upon its ability to assign the contract and, consequently, the date that interest would begin to accrue was not yet known. It violated TILA in the second transaction by conditioning the annual percentage rate ("APR") of interest upon the acceptance of a GAP Addendum. Because the approval of financing at the offered APR was conditioned upon the purchase of GAP, the cost of the GAP was required to be disclosed as a finance charge. Instead, Suburban Subaru improperly included it as part of the itemized amount financed, in violation of TILA.

Suburban Subaru's violations of ECOA, RISFA, the UCC, and TILA are all properly pled, and its motion to dismiss those claims should be denied. Further, these

statutory violations satisfy the first prong of the Connecticut Unfair Trade Practice's Act's ("CUTPA's") cigarette test, and the motion to dismiss the CUTPA count should similarly be denied.

**Argument**

## I.    Standard of Review

### A.  Rule 12(b)(6) Standard

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations and must draw inferences in a light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A plaintiff needs "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dep't Stores Co.*, 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). Thus, "[t]he issue on a motion to dismiss is not whether [the] plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp. 784, 786 (D. Conn. 1990).

## II. Suburban Subaru Violated The Equal Credit Opportunity Act By Requiring Castellanos To Use His Spouse (And Not Any Credit-Worthy Person) As A Co-Signer

### A. Suburban Subaru discriminated against Castellanos on the basis of his marital status

By requiring that Castellanos's spouse, and not any credit-worthy individual, be a co-signer, Suburban Subaru violated Regulation B's "spouse-guarantor rule," which prohibits a creditor from requiring an applicant's spouse to guarantee a credit instrument, even if the creditor requires *someone* to execute a guaranty. *See* 12 C.F.R. § 202.7(d)(5), 12 C.F.R. § 1002.7(d)(5). The rule provides that "The applicant's spouse may serve as an additional party [supporting the application], but the creditor shall not require that the spouse be the additional party." *Id*. Most relevant here is another portion of the spouse-guarantor rule, which prohibits creditors from "requir[ing] the signature of an applicant's spouse ..., other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1), 12 C.F.R. § 1002.7(d)(1). Limited exceptions allow a creditor to require an applicant's spouse's signature if the creditor reasonably believes the signature necessary to satisfy the debt in the event of default. *See* 12 C.F.R. § 202.7(d)(2)-(4), 12 C.F.R. § 1002.7(d)(2)-(4).

Regulation B prohibits "requir[ing]" the guaranty of a spouse as a general matter, regardless of whether the creditor's motivation is benign or invidious. 12 C.F.R. § 202.7(d)(1), (5), 12 C.F.R. § 1002.7(d)(1), (5); *RL BB Acquisition, LLC v. Bridgemill Commons Development Group, LLC*, 754 F.3d 380, 389 (6th Cir. 2014). "To prove a violation

of the spouse-guarantor rule, a spouse-guarantor need only prove that her spouse applied for credit, and either the creditor 'require [d] the signature of [the] applicant's spouse' if the applicant was individually creditworthy, 12 C.F.R. § 202.7(d)(1), 12 C.F.R. § 1002.7(d)(1), or the creditor 'require[d] that the spouse be the additional party' when it determined that the applicant was not independently creditworthy and would need the support of an additional party. 12 C.F.R. § 202.7(d)(5), 12 C.F.R. § 1002.7(d)(5). If the creditor seeks refuge in one of the regulatory exceptions, *see* 12 C.F.R. § 202.7(d)(2)-(4), 12 C.F.R. § 1002.7(d)(2)-(4), the creditor bears the burden of proving that the exception applies." *RL BB Acquisition, LLC,* 754 F.3d at 389.

Here, although Plaintiff was married, he did not wish to submit a joint credit application for his spouse. Amended Complaint at 3, ¶ 18. Castellanos was also not relying upon any income of his spouse to make payments for any vehicle that he purchased. *Id.* at 3, ¶ 19. Nevertheless, after Suburban Subaru told Castellanos that his credit application had not been approved by a third party, it demanded that Castellanos submit a new credit application with his spouse as co-signer in order to retain the Subaru. *Id.* at 5, ¶ 30. Notably, Suburban Subaru did not state that Castellanos could secure any co-signer but specified that the co-signer needed to be his spouse on the spurious grounds that she was a joint account holder on his bank account. *Id.* at 5, ¶ 31. Not wishing to lose the Vehicle, Plaintiff, under duress, submitted a joint credit application with his spouse. *Id.* at 5, ¶ 31.

Despite the clear applicability of the spouse-guarantor rule, Suburban Subaru claims that its acts were lawful and not in violation 15 U.S.C. § 1691d(a). Defendant's Motion to Dismiss, ECF No. 24, at 5. This section allows a party to request a signature from both parties to a marriage for the purpose of passing clear title. 15 U.S.C. § 1691d(a). The provision states, however, that it "…shall not be construed to permit a creditor to take sex or marital status into account in connection with the evaluation of creditworthiness of any applicant." *Id.* Moreover, there is no reason why clear title of the Subaru could not pass to Castellanos if his spouse was not a signatory to the transaction. There is no requirement that titles to motor vehicles be titled jointly to married couples. Suburban Subaru violated this provision by forcing Plaintiff to use his spouse as a co-signer to the exclusion of other potential co-signers. As a result, Defendant impermissibly took Plaintiff's marital status into account in this transaction.

Defendant cites to *Riggs Nat. Bank of Washington, D.C. v. Linch* to claim that it did not violate the anti-discrimination provisions of the ECOA. *Riggs Nat. Bank of Washington, D.C. v. Linch*, 829 F. Supp. 163 (E.D. Va. 1993). *Riggs* is an out-of-circuit decision that is not binding on this Court. Even if the Court were to consider *Riggs*, it should still find that Suburban Subaru discriminated against Plaintiff under ECOA because the facts here are distinguishable. In *Riggs*, the Court had to determine whether "Riggs violated the ECOA by requiring Marcia Penny Linch (the guarantor's wife) to sign the guaranty" for a promissory note. *Id.* at 168. The court reasoned that "[b]ecause Riggs did not require Marcia Linch's signature until after it determined that Samuel Linch was not independently creditworthy for the loan, … Riggs did not discriminate

against either of the Linches on the basis of their marital status." *Id.* at 169. But here, unlike in *Riggs*, Suburban Subaru had already deemed Castellanos creditworthy because it had originally agreed to enter into a retail installment contract with him alone. Additionally, Suburban Subaru refused to allow Plaintiff to secure any co-signer of his choice, instead forcing his wife to be the co-signer. If Suburban Subaru were truly concerned about Plaintiff's independent creditworthiness, it would have allowed him his choice of co-signer, and could have vetted his choice. Instead, Defendant was intent from the start on forcing Plaintiff's to have his wife be the co-signer and, as a result, Defendant unlawfully discriminated against Plaintiff on the basis of his marital status.

### B. Defendant failed to provide Plaintiff with an adverse action notice

ECOA's adverse action requirement requires that creditors provide a *written* statement of reasons to each applicant against whom they take adverse action. 15 U.S.C. § 1691(d)(2) (requiring that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor," which may be satisfied by either "providing statements of reasons in writing" or "giving written notification of adverse action" that discloses "the applicant's right to a statement of reasons" and "the identity of the person or office from which such statement may be obtained."); *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 533 (S.D.N.Y. 2015) ("A verbal denial is insufficient under the ECOA."). The Act defines "adverse action" to include a "revocation of credit" as well as a "change in the terms of an existing credit arrangement." *Id.* § 1691(d)(6). Defendant alleges that it did not violate the adverse action requirement because the "statute does not require Suburban Subaru to give the

written notification, but either Suburban Subaru or COAF." Defendant's Motion to Dismiss, ECF No. 24, at 8. Plaintiff was orally informed that his credit application had not been approved by Suburban Subaru. Amended Complaint at 5, ¶ 30. Moreover, Suburban Subaru's argument assumes the existence of facts not contained in the Amended Complaint, i.e., that COAF provided such a notice.

Defendant told Plaintiff over the phone that COAF had disapproved the application and that if he wanted to retain the vehicle, he would be required to submit a new credit application with his spouse as co-signer. *Id*. Suburban Subaru's *oral* notification to Plaintiff about COAF's denial proves that neither Suburban Subaru nor COAF complied with § 1691(d)(2). Plaintiff received no written statement of reasons he was denied, which the law requires. Amended Complaint at 7, ¶ 49. Therefore, Suburban Subaru violated the ECOA's adverse action requirement.

**III.    Suburban Subaru Violated the Retail Installment Sales Financing Act By Constructively Repossessing the Vehicle Without Providing Castellanos With the Required Post-Repossession Notice.**

**A.    Suburban Subaru conducted a constructive repossession by requiring that Castellanos enter into a new contract with his spouse as co-signer as a condition of retaining the Subaru.**

Suburban Subaru's motion to dismiss the RISFA claim is based upon the false premise that it did not repossess the subject vehicle. Contrary to Suburban Subaru's argument, it is not necessary for Castellanos to plead that Suburban Subaru took physical possession of the Vehicle to establish that a repossession occurred. Indeed, at least one Connecticut court—and many courts in other jurisdictions—has found that a secured party has constructively repossessed goods by establishing sufficient dominion

and control over the collateral. *See, e.g. Woermer v. Charter Oak Fed. Credit Union.*[1] In

*Woermer,* the Connecticut Superior Court considered whether a secured party had

committed a repossession within the meaning of RISFA and the UCC even though it

had not taken physical possession of a vehicle. The court held that a repossession had

taken place and that the debtor was entitled to notices under the two statutes:

> It would defeat the ameliorative purposes of these acts sought to be effectuated by the notice provisions, if repossession were to be narrowly defined as requiring an actual physical retaking. In other words, if such a position were adopted, the protections of these two acts would not apply in any case where the buyer does not have physical possession of the vehicle or in any case where the buyer does not choose to exercise possession or control of the goods and this is not part of a plan to defeat the creditor's security interest. Here, the plaintiffs were not in physical possession of their vehicle. Through no fault of their own, it was involved in an accident, presumably immobile and the defendant creditor did not have to physically retake the vehicle to protect its security interest and the value of such interest. But that does not mean the security holder, such as the defendant, can take steps consistent with control and dominion over the vehicle such as by declaring it has repossessed the same and by making a claim to its carrier based on such repossession. After all, a deficiency judgment is the end result of the repossession process.

*Id.*

Similarly, the Connecticut Supreme Court concluded in *Conn. Nat'l Bank v.*

*Douglas* that a creditor has constructive possession of goods when it has the power and

the manifested intent to displace the owner's control over goods or to render it

---

[1] 42 U.C.C. Rep. Serv. 2d 645, 2000 WL 1281530 (Conn. Super. Ct. 2000) (creditor's assertion of control or dominion over disabled vehicle, even without taking physical possession of it, was repossession under Article 9 and retail installment sales act).

commercially unmarketable.[2] Suburban Subaru similarly exercised such power and

manifested such intent here. It told Castellanos that if he did not enter into a new

contract with his spouse as co-signer, he could not retain possession. Castellanos has

alleged that this conduct "constituted an exercise of dominion and control over the

Vehicle that [it] constituted a constructive repossession for purposes of RISFA".[3]

Numerous courts in other jurisdictions have similarly recognized that constructive

repossessions trigger the obligation to provide repossession notices even though the

secured party never took physical possession.[4]

---

[2] *Id.*, 221 Conn. 530, 534 (1992).

[3] Second Count, ¶ 51.

[4] *See e.g. Avery v. Chrysler Credit Corp.*, 391 S.E.2d 410 (Ga. Ct. App. 1990) (repossession occurred when creditor asserted control over car in repair shop, even though creditor never took possession of it); *Elliot v. Villa Park Trust & Sav. Bank*, 380 N.E.2d 507 (Ill. App. Ct. 1978) (bank took constructive possession of collateral by inventorying it, asserting security interest in conversation with owner of building where it had been abandoned, moving some of it to more protected place, and authorizing building owner to release it to a buyer; *Wallace v. Chrysler Credit Corp.*, 743 F. Supp. 1228 (W.D. Va. 1990) (repossession occurred once creditor "gained sufficient dominion over [the] collateral" to control it, so debtor's objection at that point was untimely); *In re Jones*, 206 B.R. 569 (Bankr. M.D. Ala. 1997) (possession of certificate title is constructive possession of vehicle, sufficient to perfect "possessory" security interest in car); *Farm Credit of Northwest Fla., ACA v. Easom Peanut Co.*, 75 U.C.C. Rep. Serv. 2d 553, 559–560 (Ga. Ct. App. 2011) (delivery of goods to warehouse where secured party had right to control them is constructive possession for purposes of U.C.C. § 9-110); *Nationsbank v. Clegg*, 29 U.C.C. Rep. Serv. 2d 1366 (Tenn. Ct. App. 1996) (bank had constructive possession of vehicle after debtor left it at his daughter's house, from where bank promised to retrieve vehicle, so bank is responsible for thirteen-month delay in disposing of vehicle); *see also* Barkley Clark, The Law of Secured Transactions §§ 2.06[2], 7.07[1] (1999) (discussing what constitutes possession). Cf. *WM Capital Partners, L.L.C. v. Thornton*, 525 S.W.3d 265 (Tenn. Ct. App. 2016) (defining constructive possession as a "sufficient right to control" the collateral; creditor did not take constructive possession by declining debtor's request that it repossess collateral and instructing debtor to continue using it). ; First Republic Corp. v. Baybank, 677 N.E.2d 1146 (Mass. 1997) (no constructive possession when bank, after debtor's default, explored possibility of repossessing or

The extent of Suburban Subaru's dominion and control of the Vehicle is further manifest by the fact that it effectuated a sale of the Subaru following the constructive repossession. Despite his preference that his spouse not be a co-signer, Castellanos relented under the pressure, and Suburban Subaru prepared a new set of contract documents under which it sold the Subaru to Castellanos and his spouse. Suburban Subaru could not have sold the Subaru unless it had acquired sufficient dominion and control over the vehicle to effectuate the sale. Thus, the allegations in the Amended Complaint are more than sufficient for this Court to reasonably infer that there was a constructive repossession.

## B. Suburban Subaru violated RISFA by failing to provide a post-repossession Notice.

Having constructively repossessed the Vehicle, Suburban Subaru was required to send a post-repossession notice pursuant to Conn. Gen. Stat. § 36a-785(c). That subsection requires that the secured party provide notice of the right of reinstatement. Suburban Subaru incorrectly assumes that Castellanos had intended to allege a violation of § 36a-785(b), and not § 36a-785(c), in the Amended Complaint. That subsection permits (but does not require) the sending of an optional pre-repossession

---

selling the collateral but decided that would be too expensive, so let collateral stay where debtor left it); Great E. Mussel Farm, Inc. v. Ryshavy, 2004 WL 1878261 (Mass. App. Ct. Aug. 23, 2004) (secured party's approval of corporate debtor's attempts to sell collateral did not constitute constructive possession); McDonald v. Rockland Trust Co., 798 N.E.2d 323 (Mass. App. Ct. 2003) (secured creditor's control over defaulted debtor's business operations as part of forbearance agreement did not amount to constructive possession of the collateral).

notice of intention. If such a pre-repossession notice is given, then the secured party is excused from sending the notice required under § 36a-785(c) notice.

Here, there is no allegation that a pre-repossession notice was sent. Consequently, the Court should infer that Suburban Subaru was required to send the § 36a-785(c) notice following its constructive repossession. Castellanos has alleged that it did not send such a notice. As Suburban Subaru acknowledges in its Memorandum, statutory damages are available under § 36a-785(i) for violation of § 36a-785(c).

### IV. Suburban Subaru's Constructive Repossession of the Subaru When Castellanos Was Not in Default Violated Article 9 of the UCC

Suburban Subaru also argues that the UCC claim should be dismissed because it did not take physical possession of the Subaru. But Castellanos's arguments concerning constructive repossession apply with equal force to the UCC claim. The court in *Woermer* held a creditor's assertion of dominion and control over goods constitutes a repossession under both RISFA and Article 9 of the UCC, even in the absence of a repossession. Additionally, most of the cases cited in footnote 4 on page 10 involve Article 9 claims under the UCC.

Suburban Subaru also contests liability under the UCC by arguing that the transaction was not consummated because the "financier" had rejected Castellanos's credit application. This argument ignores the contents of the Amended Complaint, which avers at ¶ 23 that "The First Contract listed [Castellanos] as the Buyer, and Suburban Subaru as the Seller-Creditor." Castellanos has also pled that Suburban Subaru (as the "Seller-Creditor") constructively repossessed the Subaru even though

Castellanos was not in default on any of his obligations under the contract. *See* Amended Complaint, ¶¶ 32, 54-55.

Suburban Subaru violated Conn. Gen. Stat. § 42a-9-609(a), which provides that a secured party may repossess only when a debtor is in default.[5] Notably, Suburban Subaru's inability to assign the contract to a third party does not constitute a default, and it does not void the contract.[6] Indeed, Connecticut law prohibited Suburban Subaru from originally tendering possession of the Vehicle to Castellanos if financing was not secured. *See* Conn. Gen. Stat. § 14-62(h). That subsection provides:

> No dealer licensed under section 14-52 shall deliver or permit a retail purchaser to take possession or delivery of any used motor vehicle until such purchaser has paid in full for the vehicle or until financing offered by the dealer for such vehicle has been approved by the lending institution or other entity through which any financing agreement has been made. Any dealer that violates this subsection shall be guilty of a class B misdemeanor.

---

[5] *See e.g., See, e.g., Christie's Inc. v. Davis,* 247 F. Supp. 2d 414 (S.D.N.Y. 2002)*; Am. Furniture Co. v. Extebank,* 676 F. Supp. 455 (E.D.N.Y. 1987) (default is the only precondition for repossession; U.C.C. does not require that creditor declare a default)*; Corbin v. Regions Bank,* 574 S.E.2d 616 (Ga. Ct. App. 2002) (inducing debtor to surrender collateral when he was not in default was wrongful repossession and conversion)*; Fulton v. Anchor Sav. Bank, 452 S.E.2d 208* (Ga. Ct. App. 1994); *Ansley v. Conseco Fin. Serv. Corp.,* 2002 WL 31955217 (Mich. Ct. App. Dec. 17, 2002).

[6] See e.*g., See Streit v. Fireside Chrysler − Plymouth, Inc.,* 697 F.2d 193 (11th Cir. 1983) (contract does not become "unconsummated" just because assignment of retail installment contract is never executed); *Muro v. Hermanos Auto Wholesalers, Inc.,* 514 F. Supp. 2d 1343 (S.D. Fla. 2007) (nothing in credit agreement indicates that deal is conditional); *McFarland v. Bob Saks Toyota, Inc.,* 466 F. Supp. 2d 855 (E.D. Mich. 2006) (dealer could not show it was entitled to repossess vehicle when installment sales contract had no language that transaction was contingent upon financing and consumer had not defaulted); *Walker Mobile Home Sales v. Walker,* 965 S.W.2d 271 (Mo. Ct. App. 1998) (consumer not liable to dealer when consumer offered to make installment payments to dealer, but dealer refused to accept payments when prospective assignee refused to take assignment).

If this transaction was made contingent upon approval by a third party that had not been secured, then Suburban Subaru would have violated this law and would be guilty of a misdemeanor. But the Amended Complaint does not allege a contingent transaction,[7] instead asserting that the First Contract was a valid credit agreement with Suburban Subaru as the seller-creditor.

Suburban Subaru was the creditor under the retail installment contract, and it constructively repossessed the Subaru even though Castellanos was not in default under that contract. Castellanos has pled a valid claim for wrongful repossession under the UCC, and the motion to dismiss that count should be denied.

---

[7] Castellanos acknowledges that his claim concerning the Truth in Lending Act in the first transaction, addressed at V.A. below, depends upon a finding that the first contract was contingent in nature. That claim is asserted in the alternative to the claims asserted under RISFA and the UCC.

**V. Suburban Subaru Violated TILA By Failing to Disclose The APR In The First Contract As An Estimate And By Imposing The Purchase Of GAP As A Condition Of the Offered APR In The Second Contract.**

**A. The Truth in Lending Act**

TILA is a remedial, strict liability statute that is to be liberally construed, and it requires no proof of deception or actual damages to obtain relief thereunder.[8] Any defects in the disclosure process, even technical defects, must be recognized without requiring any proof that the consumer was confused.[9] When multiple violations of TILA are present, a consumer may not recover multiple instances of statutory damages. But when TILA violations concern separate contracts or transactions, a consumer may recover statutory damages with respect to each contract.  In this case, Suburban Subaru violated TILA in both transactions.

TILA requires creditors in any closed end credit plan to

> [D]isclose […] the identity of the creditor required to make disclosure […] the "amount financed" using that term […]  a statement of the consumer's right to obtain, upon request, a written itemization of the amount financed […] the "finance charge" […] the finance charge expressed as an "annual percentage rate, using that term […] the "total of payments" […] the number, amount and due dates or period of payments scheduled to repay the total of payments […] the "total sale price" […] descriptive explanations of the terms "amount financed", "finance charge", "annual percentage

---

[8] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.*, 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1, 2 (10th Cir. 1975) (en banc).

[9] *See Jenkins v. Landmark Mortgage Corp.*, 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).

> rate", "total of payments" and "total sale price" […] where credit is secured, a statement that a security interest has been taken […] [the dollar amount of late charges] […][10]

Creditors are also required to make numerous other disclosures. *Id.* While TILA makes no formal requirement as to the operative document in which such disclosures should be made, Regulation Z, which implements and interprets TILA, specifies that creditors "shall make the disclosures required […] clearly and conspicuously in writing, in a form that the consumer may keep."[11]

Because Defendant chose to treat its First Contract with Plaintiff as being contingent on obtaining financing from COAF,[12] it was required to disclose that the numbers in the First Contract were merely estimates. Since Defendant presented GAP insurance as mandatory, Defendant violated TILA in connection with the Second Contract by failing to treat GAP insurance as a finance charge in the Second Contract.

### B. Suburban Subaru violated the Truth in Lending Act as to the First Contract By Failing To Disclose That the APR Was An Estimate.

Suburban Subaru engaged in a "spot delivery" or a "yo-yo sale." In yo-yo transactions, as detailed in the opening paragraphs of the Amended Complaint (*see* ¶¶ 7-14), a consumer signs a retail installment sales contract with a car dealer and drives off with the car, but the dealer has not yet assigned the contract to the bank and received payment for the assignment. The dealer calculates that there is a high

---

[10] 15 U.S.C. § 1638.

[11] 12 C.F.R. § 226.17(a).

[12] As discussed in the sections addressing the RISFA and UCC claims, the First Contract was not contingent. However, if it was contingent as Suburban Subaru claims, then it violated TILA in that transaction as detailed herein.

likelihood of being able to sell the contract to the lender whose name appears on the contract or, if not, the dealer can reel the consumer back in, like a yo-yo on a string, and demand that the consumer put down more money, accept a higher interest rate, or agree to other less favorable terms (like the addition of a co-signer or the inclusion of GAP). The consumer has, however, already closed the transaction with the dealer, and this second contract is entirely for the benefit of the car dealer. Once a consumer has sold or traded in his or her old car and started driving a newly purchased car, it becomes that much easier for a dealer to fraudulently induce a consumer agreeing to less favorable terms.

But this practice of selling cars and then attempting to unwind the deals runs head-first into the disclosure requirements of TILA. When a car dealer sells a car on credit, not only can the dealer not charge interest before the proceeds are disbursed, but it cannot disclose the terms as if the financing had been disbursed as of the date the consumer drove away with the car. Instead, the TILA disclosures should be labeled estimates because the starting date has not been determined and the precise annual percentage rate (APR) cannot yet be computed.[13]

---

[13] *See Salvagne v. Fairfield Ford, Inc.*, 794 F. Supp. 2d 826 (S.D. Ohio 2010) (use of a separate spot-delivery agreement imposing a condition subsequent on a fully integrated, binding installment sales contract purporting to contain the entire agreement between the parties violates TILA as consumers are unable to compare credit offers); *Patton v. Jeff Wyler Eastgate, Inc.*, 608 F. Supp. 2d 907 (S.D. Ohio 2007) (TILA violation when disclosures rendered illusory by use of contradictory spot delivery form).

Regulation Z, which enforces TILA, requires the creditor to identify the disclosures as estimates when it does not have information necessary to make accurate disclosures.[14] In yo-yo sales structured as a condition precedent sale, the start of the first payment period is an indeterminate date, because the extension of credit does not occur unless and until the condition is satisfied. Thus, the annual percentage rate of interest cannot be known until it is while the payment due dates are fixed in the contract. As the finance charges stay constant and the length of the financing is fewer days than if it started on the date of the disclosure, the APR increases from the rate initially disclosed, but by an amount as yet unknown to the creditor.

When Suburban Subaru entered into the First Contract with Plaintiff, it knew or should have known that it did not have a firm commitment from COAF. Since it treated the sale as contingent upon that assignment, the proffered Annual Percentage Rate ("APR") was an estimate, and it was treated by Suburban Subaru as an estimate, regarding the terms of the credit that it might provide to Plaintiff. Amended Complaint at 9, ¶ 58. This is because the date that the credit would actually be extended as delineated by the transfer of title to Plaintiff was unknown at the time that Suburban Subaru provided the disclosures in the first transaction. *Id*. Through its failure to disclose the APR as an estimate on the First Contract, Suburban Subaru violated TILA by way of Regulation Z § 226.17(c)(2).[15]

---

[14] 12 C.F.R. § 1026.17(c)(2) [§ 226.17(c)(2)].
[15] *Id*. at 9, ¶ 59.

**C. Suburban Subaru violated the Truth in Lending Act as to the Second Contract by conditioning the APR on the purchase of GAP and by failing to disclose the cost of GAP as a finance charge.**

TILA requires that a creditor clearly and conspicuously disclose the amount of the finance charge in a close-ended credit transaction. TILA specifies that the amount of the "finance charge" should be determined:

> as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction.[16]

Regulation Z further specifies that "finance charge" includes amounts that may be payable to third parties other than the creditor,[17] including

> Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.[18]

By telling Castellanos he would be required to pay a higher APR if he did not purchase the GAP addendum or that he might not be approved for financing, Suburban Subaru conditioned the APR on the purchase of the GAP. Amended Complaint at 22, ¶s 39-43 & 9, ¶ 61. Consequently, GAP was not optional but was a mandatory condition of the extension of credit at the lower rate of interest. *Id*. at 22, ¶s 39-43 & 9, ¶ 62. The cost

---

[16] 15 U.S.C. § 1605(a).
[17] 12 C.F.R. § 226.4(a)(1).
[18] 12 C.F.R. § 226.4(b)(6).

of GAP was not included as part of the finance charge in the disclosures in the Second Contract but was instead incorporated as part of the amount financed, even though it was ineligible for exclusion from the finance charge under 15 U.S.C. § 1605(b)(1) and Reg. Z § 1026.4(d)(1)(i). *Id*. at 22, ¶s 39-43 & 9, ¶ 63. Suburban Subaru violated the TILA, 15 U.S.C. § 1638(d), by improperly including the cost of GAP as part of the amount financed and by not including it in the finance charge or in the calculation of the annual percentage rate of interest. *Id*. at 22, ¶s 39-43 & 9, ¶ 64.

Suburban Subaru claims that the GAP Addendum was not mandatory because Castellanos did have the option of declining GAP. This argument misses the point, because Castellanos did not have the option of financing the Subaru on the offered terms unless he purchased GAP. The extension of credit on the stated terms was therefore conditioned upon the inclusion of GAP, which renders the cost of GAP a finance charge. Suburban Subaru violated TILA by improperly including the cost of GAP as part of the amount financed and by excluding it from the finance charge disclosure.

VI.    **Suburban Subaru Violated the Connecticut Unfair Trade Practices Act By Its Numerous Unfair Acts And By Its Violations of Numerous Connecticut and Federal Statutes**

   A.  **Suburban Subaru Has Engaged In Multiple Unfair Acts**

The actions of Suburban Subaru in representing to Castellanos that he had been approved for financing, providing him with the first contract which contained no condition precedent or condition subsequent to its being fully enforceable, delivering

the vehicle to Castellanos, and then repossessing the Vehicle, and its other conduct as previously alleged, constituted unfair and deceptive acts in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* Additionally, its refusal to honor the First Contract and its improper threat to repossess or its improper constructive repossession of the Subaru also constituted unfair acts that violated Conn. Gen. Stat. § 14-62(h) (discussed at pp 13-14), which prohibits a car dealership from releasing a vehicle to a consumer if financing has not been secured. Violation of this statute is a *per se* violation of CUTPA by operation of Conn. Agency Reg. § 42-110b-28(b)(23), which renders any violation of a law or regulation concerning the sale of motor vehicles an unfair act within the meaning of CUTPA.

Suburban Subaru also acted unfairly by its improper demand that Castellanos either enter into a new contract or surrender the vehicle; its improper demand that he pay an additional $1,000; and its improper demand that his spouse submit a credit application and co-sign for the Subaru; its improper tying of credit approval and the offered rate of interest to the purchase of the GAP addendum; and its improper requirement that a new credit application be submitted and its forwarding of the application to COAF and to Santander.

Suburban Subaru's acts as described above were unfair as such to cause substantial injury to consumers, including Plaintiff. Plaintiff has sustained an ascertainable loss as a result of Suburban Subaru's acts because he was required to pay an additional down payment of $1,000, he lost a portion of the $895 cost of GAP, he has

paid interest on the cost of the GAP, his credit score was diminished, and he was not

able to finance and own the Vehicle without his spouse being a co-signer.

**B.  Suburban Subaru's Statutory Violations Satisfy CUTPA's Cigarette Test**

Courts use the "cigarette test"[19] in determining whether a trade practice is unfair

under CUTPA:

> It is well settled that in determining whether a practice
> violates CUTPA we have adopted the criteria set out in the
> cigarette rule by the [F]ederal [T]rade [C]ommission for
> determining when a practice is unfair: (1) [W]hether the
> practice, without necessarily having been previously
> considered unlawful, offends public policy as it has been
> established by statutes, the common law, or otherwise—in
> other words, it is within at least the penumbra of some
> common law, statutory, or other established concept of
> unfairness; (2) whether it is immoral, unethical, oppressive,
> or unscrupulous; (3) whether it causes substantial injury to
> consumers, [competitors or other businesspersons].... All
> three criteria do not need to be satisfied to support a finding
> of unfairness. A practice may be unfair because of the degree
> to which it meets one of the criteria or because to a lesser
> extent it meets all three.... Thus a violation of CUTPA may
> be established by showing either an actual deceptive practice
> ... or a practice amounting to a violation of public policy.... In
> order to enforce this prohibition, CUTPA provides a private
> cause of action to [a]ny person who suffers any ascertainable
> loss of money or property, real or personal, as a result of the
> use or employment of a [prohibited] method, act or
> practice....[20]

Castellanos has asserted violations of ECOA, RISFA, the UCC and TILA. He has

also asserted that Suburban Subaru violated Conn. Gen. Stat. § 14-62(h). The allegations

of violations of these statutes satisfy the first prong of the cigarette test, *i.e.*, Suburban

---

[19] *See FTC v. Sperry & Hitchinson Co.,* 405 U.S. 233 (1972).
[20] *Ulbrich v. Groth*, 310 Conn. 375, 409–10, 78 A.3d 76, 100 (2013)

Subaru engaged in unlawful conduct that offends public policy as established by state and federal statutes.

The Connecticut Supreme Court held in *Cheshire Mortg. Service, Inc. v. Montes*[21] that a TILA violation may also constitute a CUTPA violation if the consumer can show substantial injury, generally in the form of a monetary loss.[22] Judge Shea also found that that violations of TILA and RISFA by a car dealership constituted CUTPA violations.[23] In this case, Castellanos was required to have his spouse co-sign for the Subaru, he was obligated to purchase GAP in order to secure a lower APR, and he was required to pay an additional $1,000 towards the Subaru.

A violation of ECOA similarly "offends public policy as it has been established by statutes". In Langan v. Johnson & Johnson Consumer Companies, Inc.[24], the district court concluded that although courts in this state had not previous recognized that a violation of the Federal Food, Drug and Cosmetic Act ("FDCA") could establish a CUTPA claim, it was a violation of an established public policy. Similarly, an ECOA

---

[21] 223 Conn. 80, 114 (1992); *see also Conley v. 1008 Bank Street, LLC,* 2020 WL 4926599, at *15 (D. Conn. 2020) ("A violation of TILA offends the public policy embodied in TILA, and several courts have thus held that a TILA violation constitutes a CUTPA violation.")

[22] *Id.,* 113.

[23] *Munoz v. JLO Auto., Inc.*, No. 3:19-CV-01793 (MPS), 2020 WL 6607789, *3 (D. Conn. 2020): "[a] violation of TILA offends the public policy embodied in TILA, and several courts have thus held that a TILA violation constitutes a CUTPA violation."

[24] 95 F. Supp. 3d 284, 290 (D. Conn. 2015) ("[P]laintiff has sufficiently pleaded a claim that defendant's statements are unfair in violation of CUTPA. First, plaintiff plausibly alleges that defendant's statements offend an established public policy: the FDCA's prohibition on sunscreen 'labeling [that] is false or misleading in any particular.'")

violation constitutes an offense to public policy, even though CUTPA liability has not previously been considered or recognized.

The violations of the other statutes similarly satisfy the first prong of the cigarette test. Additionally, the allegations support a finding that Suburban Subaru acted unscrupulously and that its conduct hurts consumers, thereby satisfying the other two prongs. Because satisfaction of even a single prong can support a CUTPA claim, the motion to dismiss should be denied based upon the violations of ECOA, RISFA, the UCC, and TILA.

## Conclusion

Castellanos has asserted valid claims, and the motion to dismiss should be denied.

PLAINTIFF, PABLO CASTELLANOS-HERNANDEZ

By_/s/ Daniel S. Blinn_____
        Daniel S. Blinn (ct 02188)
        Consumer Law Group, LLC
        35 Cold Spring Road, Suite 512
        Rocky Hill, CT  06067
        Tel: (860) 571-0408
        Fax: (860) 571-7457
        dblinn@consumerlawgroup.com

<u>CERTIFICATION</u>

I hereby certify that on November 17, 2022, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Daniel S. Blinn*
Daniel S. Blinn